IN THE COMMONWEALTH COURT OF PENNSYLVANIA

William G. Hastings, Jr.,              :
                                       :
                    Petitioner         :
                                       :  No. 104 C.D. 2021
          v.                           :  Submitted: March 11, 2022
                                       :
Unemployment Compensation              :
Board of Review,                       :
                                       :
                    Respondent         :


BEFORE:   HONORABLE ANNE E. COVEY, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                                   FILED: April 13, 2022


        William G. Hastings, Jr. (Claimant) petitions for review of the order of
the Unemployment Compensation Board of Review (Board) affirming the decision
of a Referee that denied Claimant's application for benefits under Section 402(b) of
the Unemployment Compensation (UC) Law (Law)[1] because he resigned from his
employment without a necessitous and compelling reason. We affirm.

        The relevant findings of fact made by the Board, are as follows. *See*
Certified Record (CR) at 138-39, 155. Claimant worked for Kravitch Machine

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(b). Section 402(b) provides, in pertinent part, that "[a]n employe shall be ineligible for compensation for any week . . . [i]n which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature . . . ." *Id.*

Company (Employer) as a full-time machine operator from January 12, 2019, to March 20, 2020. Employer's business involves the provision of tools to public utility companies. On March 20, 2020, Claimant's last day of work, Employer called its employees into a meeting to advise them that the Governor had issued a directive regarding the new coronavirus (COVID-19) pandemic, and that Employer was making several inquiries about whether it was considered to be an essential service. Claimant expressed skepticism and became upset about the uncertainties surrounding the Governor's directive. Employer told its employees that they could either stay at work until more information was gathered, or they could leave and go home, but stay close to the telephone because Employer would call with information about whether it would have to shut down its operations. Ultimately, Employer was designated as an essential service, and it was able to remain open. After Claimant expressed continuing frustration, Employer told him that he could leave until the matter was further settled. Claimant went home and did not return to work. Although Claimant has several medical conditions, Claimant did not confer with his physician to see whether he should continue working during the pandemic directive. Claimant also did not ask Employer for other work or an accommodation. Because Claimant did not return to work, and did not contact Employer any further, Employer sent Claimant a letter dated March 25, 2020, advising Claimant that he was no longer employed.

On March 25, 2020, Claimant submitted an online application for benefits. CR at 15-22. On July 22, 2020, the Department of Labor and Industry's Office of Unemployment Compensation Benefits issued a Notice of Determination (Determination) in which it found that Claimant was not ineligible for benefits under Section 402(b) of the Law because "[C]laimant quit for personal reasons . . . in order

2

to self[-]quarantine with his family due to [COVID]-19. [He] has pre[]existing health conditions that make him at high risk for contracting the virus." *Id.* at 37. On August 3, 2020, Employer appealed the Determination to a Referee alleging, *inter alia*, that at the time of separation, Claimant did not notify Employer that he quit; Claimant did not discuss the reasons for leaving his employment; Claimant made no effort to resolve any issues with Employer prior to leaving; and Claimant did not inform Employer of any preexisting medical conditions. *Id.* at 44-53.

Before the Referee, Employer's owner, Nick Kravitch (Owner) testified, in pertinent part:

> [O]n July 17[, 2020,] I received an Employer questionnaire, and one of the things that was mentioned in the course was Number 8. It says, prior to separation, did []Claimant discuss the situation with you or make any other attempts to resolve the situation which caused him [] to voluntarily quit or t[ake] a leave of absence, and the answer is no. Prior to him leaving, he didn't even discuss anything with me. . . . This meeting [on January 8, 2020,] was held at approximately 9 a.m. with [Claimant] in attendance, with [Owner], HR/personnel Margo Kravitch [Owner's Wife], [and] plant supervisor William Hildebrand[.] [Claimant] was reminded that he's missed 21 days during the year of 2019. . . . [Claimant] was given notice that any further absentee days would require a medical excuse. . . . During this meeting then, we gave him every opportunity to supply us with medical documents -- documents from doctors. . . . I need a document like that. I have no document. I did not have any medical doctors, all the 14 months he was there -- when he left on March 20th, I did not have any documents. . . . And in the last, you know, six weeks before he left, we were talking about the coronavirus at different times. Nowhere in that period of time did he say, hey, I got this condition and if I get the coronavirus I'm going to die or something like that. He never mentioned that.

3

Prior to the separation, []Claimant did not discuss the situation with me or make any other attempts to resolve the situation which caused him to voluntarily quit as indicated in the Employer Questionnaire. . . . The PA Department of Health has given us a strategy to work with. We've developed our own strategy, and it's obviously worked because we've had four months of -- or five or six months or whatever, we haven't had anybody with the coronavirus. Okay. We had followed certain strategies that allowed us to work safely throughout this time without anybody getting the virus. Okay. Now, had he come to me -- now, the thing is, I -- and I'm saying it again and again, and my wife mentioned it, he never c[a]me to me. If he comes to me -- and I'm a reasonable man. We have 20,000 square f[ee]t. We have two 5,000[-]square-foot buildings, two 3,000[-]square-foot buildings, one [2,500] square-foot building on 100 acres of rural Pennsylvania three miles from []his house. So I could have put him in his own building if we had to. I could give him his own building. . . . He could have also worked outside. He could have worked a different shift. If he was really concerned about it, I would say, hey, you know, you could work 6:00 to 2:00 or 3:00 or whatever. And he's a good worker, and I would trust [him] that way. Okay? Now, he could also work from home. . . . So there w[ere] many alternatives to explore. So when they said, whenever the examiner said []Claimant has no alternatives to exhaust, that's totally ridiculous. In conclusion, [Claimant] left on March 20th of his own free will. He was not told or encouraged to leave. A meeting at 10:30 a.m. with all the employees was called to discuss that we are an essential business. [Claimant] became immediately enraged and badgered and bucked me during this meeting in front of all the employees. During this meeting, [Claimant] clearly stat[ed] he's not concerned for his health prior to leaving the meeting. [Claimant] accused me of trying to kill [another elderly employee,] Steve. [Claimant] left company-issued tools that he was required to leave prior to quitting without being asked to leave the tools. [Claimant] left without discussing any health issues or trying to resolve any of his health concerns.

4

CR 123-24, 126, 131-32.

Likewise, Owner's Wife testified before the Referee, in relevant part, as follows:

[]Claimant had been bullying [Owner] during this initial morning meeting. As []Claimant walked away from this meeting with another employee in my direction, it appeared to me that he was attempting to badger and coerce another employee to go home along with him. In order to d[iffuse] the situation, since []Claimant only lived three miles away, I said to [him] if he felt uncomfortable maybe he should go home, meaning, in accordance with the meeting he just walked out of, he could go home temporarily until we reconvened for [Owner's] meeting later in the day. He knew and I knew that [Owner] was going to call him back once we reconvened to clarify if we were essential and would remain open and work. []Claimant did not go home. The timesheet has him in at two and a half hours. This was at 20 after 8:00 in the morning. He didn't go home until he quit at 10:30. He immediately said to me, no, I'll go to work. I said, okay, let's get to work, hoping to move [him] along to his workstation and d[iffuse] any pressure on the other employees. . . . I thought this was a settled issue because he stayed, but I understand now that []Claimant is saying I gave him carte blanche to go home at any time for health reasons. That was not the case. I clearly did not. Health reasons were never discussed. The conversation was about whether we were essential or not. For him to state later that he left because I said he could go home regarding his health makes no sense. If I gave him permission to go home because of his health and his health was an issue to him, he would have left at that moment. Nothing changed between the meetings. He left in the second meeting around 10:30, right after [Owner] announced that we were an essential business. While he was leaving in a rage, he stated that he was not concerned for his health in front of the entire group. This is why the UC Law encourages communication between the employer and employee. []Claimant left in a rage, making no effort to resolve any issues.

5

CR at 128-29.

Ultimately, on September 1, 2020, the Referee issued a Decision/Order in which she determined that Claimant had voluntarily left work without cause of a necessitous and compelling nature for doing so and, therefore, was ineligible for benefits under Section 402(b). *See* CR at 138-42. On September 12, 2020, Claimant appealed the Referee's Decision/Order to the Board. *See id.* at 144-48.[2] On January 27, 2021, the Board issued an Order disposing of Claimant's appeal that states:

> The [Board], after considering the entire record in this matter, concludes that the determination made by the Referee is proper under the [Law]. While the Board is sensitive to [C]laimant's health concerns related to the COVID-19 pandemic, the Board finds that [C]laimant made no efforts to discuss his health concerns with [E]mployer and made no efforts to explore any solutions or alternatives with [E]mployer, to allow him to safely continue work with [E]mployer. Therefore, the Board adopts and incorporates the Referee's findings and conclusions, and enters the following order:
>
> The decision of the Referee is affirmed.

CR at 155. Claimant then filed the instant petition for review of the Board's Order affirming the Referee's Decision/Order that he is ineligible for benefits under Section 402(b) of the Law.

---

[2] Specifically, Claimant stated the following basis for his appeal:

> I disagree with the determination and am filing this appeal because many of the "Findings of Fact" are inaccurate or do not apply to my situation. In Findings of Fact (FOF) #7 and #9, it clearly states that my employer told me I could go home and that they would notify me of any further findings or matters. They did not. The section that was denied, Section 402(b), assumes I quit or voluntarily left my employment. I neither quit nor voluntarily left.

CR at 148.

On appeal,[3] Claimant contends that the Board erred in affirming the Referee's Decision/Order that he is ineligible under Section 402(b) because he was working in an unsafe work environment because COVID-19 protocols/procedures were not in place at the time that he quit. Claimant also asserts that he had an immunocompromised condition that put him at high risk if he contracted COVID-19. As a result, due to the lack of COVID-19 protocols/procedures, Claimant contends that he was forced to quit his employment due to his health.

However, as this Court has recently explained:

> To show a necessitous and compelling reason under Section 402(b) of the Law, a claimant must show that (1) circumstances existed which produced real and substantial pressure to terminate employment; (2) such circumstances would compel a reasonable person to act in the same manner; (3) the claimant acted with ordinary common sense; and (4) the claimant made a reasonable effort to preserve her employment. *Solar Innovations, Inc. v. Unemployment Comp[ensation Board] of Rev[iew]*, 38 A.3d 1051, 1056 (Pa. Cmwlth. 2012). Whether the reason for [the c]laimant's concerns were inadequate safety measures by [the e]mployer or fears related to her and/or her father's health, or both, [the c]laimant's burden to make a reasonable effort to preserve her employment required her to give notice to [the e]mployer as to her concerns and health conditions and allow [the e]mployer the opportunity to modify her work conditions. This is the case even where there is a real and serious safety concern, *see Iaconelli v. Unemployment Compensation Board of Review*, 423 A.2d 754, 756 (Pa. Cmwlth. 1980), or where a claimant has a medical condition which endangers her, *see St. Clair Hospital v. Unemployment Compensation Board of Review*, 154 A.3d 401 (Pa. Cmwlth. 2017). Once

---

[3] Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, and whether necessary findings of fact are supported by substantial evidence. *Kirkwood v. Unemployment Compensation Board of Review*, 525 A.2d 841, 843-44 (Pa. Cmwlth. 1987).

communicated, an employer must have a reasonable opportunity to make accommodations with respect to the work conditions and/or medical condition. *See Blackwell v. Unemployment Comp*[*ensation Board*] *of Rev*[*iew*], 555 A.2d 279, 281-82 & n.6 (Pa. Cmwlth. 1989).

*Lundberg v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 29 C.D. 2021, filed October 14, 2021), slip op. at 3.[4]

As stated above, both the Referee and the Board found as fact that Claimant failed to notify Employer of his medical condition or his concerns regarding the lack of safety in the workplace with respect to COVID-19. As outlined above, both Owner's and Owner's Wife's testimony before the Referee amply support these findings of fact.[5] As a result, the Board properly determined that

---

[4] *See* Pa. R.A.P. 126(b) ("As used in this rule, 'non-precedential decision' refers to . . . an unreported memorandum opinion of the Commonwealth Court filed after January 15, 2008. [] Non-precedential decisions . . . may be cited for their persuasive value.").

[5] We will not accede to Claimant's request to review the Board's credibility determinations based on his testimony or that of his wife before the Referee. As this Court has stated:

> [I]t is well settled that the Board is the ultimate finder of fact in unemployment compensation proceedings. Thus, issues of credibility are for the Board which may either accept or reject a witness' testimony whether or not it is corroborated by other evidence of record. Findings of fact are conclusive upon review provided that the record, taken as a whole, contains substantial evidence to support the findings. This Court must examine the evidence in the light most favorable to the party [that] prevailed before the Board, and to give that party the benefit of all inferences that can be logically and reasonably drawn from the testimony.

*Chapman v. Unemployment Compensation Board of Review*, 20 A.3d 603, 607 (Pa. Cmwlth. 2011) (citations omitted). *See also Wise v. Unemployment Compensation Board of Review*, 111 A.3d 1256, 1262 (Pa. Cmwlth. 2015) ("It is irrelevant whether the record contains evidence to support findings other than those made by the fact finder; the critical inquiry is whether there is substantial evidence in the record to support the findings actually made . . . ."). As outlined above, the Board's findings are amply supported by evidence in the certified record of this case, and these findings support the Board's determination that Claimant is ineligible for benefits under Section 402(b).

Claimant is ineligible for benefits under Section 402(b) of the Law. *See Lundberg*, slip op. at 4 ("[The c]laimant's failure to give [the e]mployer notice of her concerns or an explanation of her reasons for resigning at the time she did so negated any opportunity for [the e]mployer to ameliorate the situation."); *id.* ("While one can sympathize with [the c]laimant's fears in the face of the chaos attendant to the early stages of the COVID-19 pandemic, the law does not excuse her of the duty to inform [the e]mployer of her safety concerns and health problems and afford [the e]mployer the opportunity to mitigate and/or accommodate them.").

Accordingly, the Board's order is affirmed.


_____
MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

William G. Hastings, Jr.,     :
          :
          Petitioner   :
          : No. 104 C.D. 2021
         v.       :
          :
Unemployment Compensation  :
Board of Review,       :
          :
        Respondent : 

# **O R D E R**

AND NOW, this 13th day of April, 2022, the order of the Unemployment Compensation Board of Review dated January 27, 2021, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge